IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EVEREST NATIONAL INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | No. 22 C 3368 |
| v. | ) ) | Judge Ronald A. Guzmán |
| CYNTHIA KOMAREK, et al., | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons explained below, plaintiff's motion for summary judgment is granted.

## BACKGROUND

This is a declaratory-judgment action in diversity in which plaintiff, Everest National Insurance Company ("Everest"), seeks a declaration that it does not have a duty to defend or indemnify Cynthia Komarek under two securities broker/dealer professional-liability insurance policies (the "Policies") plaintiff issued to non-party Royal Alliance Associates, Inc. with respect to the claims asserted against Komarek in two state-court lawsuits pending in the Circuit Court of Cook County (the "Underlying Suits"). The Policies (to which the parties refer as the "191 Policy" and the "201 Policy")[1] include SagePoint Financial, Inc. ("SagePoint") among the insured broker/dealers. Komarek, a financial professional, was a registered representative of SagePoint.

One of the state-court suits (the "Moreth Suit") was brought by Cary Moreth against Komarek, Grant Birkley, Matthew Piercey, Rodney Piercey, Kenneth Piercey, Piercey & Associates, Ltd., SagePoint, Midland Trust Co., and Midland IRA, Inc. The other suit (the "Rieber Suit") was brought against the same defendants by Mary Rieber, the late James Rieber by his personal representative, Victor Rieber, Harry Howarth, and Diane Howarth. The state-court plaintiffs allege, among other things, that Komarek conspired with Birkley,[2] who was another financial professional, to defraud them as part of a multimillion-dollar Ponzi scheme allegedly orchestrated by Matthew Piercey. According to the state-court plaintiffs, Komarek and Birkley operated an entity apart from SagePoint that was known as NBB Group. NBB Group was associated with the Pierceys and their entities, and Komarek and Birkley referred their clients to

---

[1] The policy period for the 191 Policy ran from December 31, 2019 to December 31, 2020. The policy period for the 201 Policy ran from December 31, 2020 to December 31, 2022.

[2] Everest originally named Birkley as a defendant in the instant case but later voluntarily dismissed him after he filed for bankruptcy.

the Pierceys and their entities for estate and financial planning. The state-court plaintiffs further allege that Komarek and Birkley participated in the sale of investment products offered by Matthew Piercey and entities he controlled and that instead of transferring plaintiffs' assets to certain fixed-income investments, Komarek, Birkley, and Matthew Piercey caused those client assets to be used for Matthew Piercey's personal expenses and to make payments to third parties in furtherance of the Ponzi scheme, resulting in significant losses to plaintiffs.

In November 2020, Matthew Piercey was indicted on federal charges of wire fraud, mail fraud, witness tampering, "concealment" money laundering, and criminal forfeiture. The Moreth Suit was filed on February 22, 2022, and the Rieber Suit was filed on March 11, 2022. In May 2022, Everest denied Komarek coverage.

The following month, Everest filed the instant five-count complaint for declaratory judgment. It seeks declaratory judgment that it has no duty to defend or indemnify Komarek under the Policies because there is no coverage under the Policies and certain of their exclusions apply. Everest moves for summary judgment.

## DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmovant, Komarek. *See Liberty Mut. Fire Ins. Co. v. Clayton*, 33 F.4th 442, 447 (7th Cir. 2022).

A federal court sitting in diversity interprets an insurance policy as a matter of state law. *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015). The parties appear to agree that Illinois law governs.[3] Under Illinois law, "the construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court which are appropriate subjects for disposition by way of summary judgment." *Hurst-Rosche Eng'rs, Inc. v. Com. Union Ins. Co.*, 51 F.3d 1336, 1342 (7th Cir. 1995) (internal punctuation omitted) (citing *Crum & Forster Managers Corp. v. Resol. Tr. Corp.*, 620 N.E.2d 1073, 1077 (Ill. 1993)). The court's primary objective is to ascertain and give effect to the parties' intention, as expressed in the policy language. *Windridge of Naperville Condo. Ass'n v. Phila. Indem. Ins. Co.*, 932 F.3d 1035, 1039 (7th Cir. 2019) (citing *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005)). The burden is on the insured to prove that a claim falls within the coverage of the policy. *PQ Corp. v. Lexington Ins. Co.*, 860 F.3d 1026, 1033 (7th Cir. 2017). The insurer, however, has the burden of proving that exclusions from coverage apply; the insured, in turn, has the burden of proving that an exception to an exclusion restores coverage. *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 347 (7th Cir. 2010).

---

[3] Neither Everest nor Komarek disputes that the forum state's law controls or raises any choice-of-law issue, and both parties cite Illinois law. The Seventh Circuit decisions cited in this opinion apply Illinois law.

An insurer's duty to defend is generally broader than its duty to indemnify because the duty to defend arises in cases of "arguable or potential coverage," while the duty to indemnify "arises only in circumstances of actual coverage; if the insurance policy does not cover what is alleged in the claim, the insurer will not have a duty to indemnify based on that claim." *Clayton*, 33 F.4th at 447. An insurer must provide its insured with a defense when the allegations in the underlying complaint are even potentially within the scope of the policy's coverage. *Medmarc Cas. Ins. Co. v. Avent Am., Inc.*, 612 F.3d 607, 613 (7th Cir. 2010). "This is true even if the allegations are groundless, false, or fraudulent, and even if only one of several theories of recovery alleged in the complaint falls within the potential coverage of the policy." *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 315 (Ill. 2006); *see also Int'l Mins. & Chem. Corp. v. Liberty Mut. Ins. Co.*, 522 N.E.2d 758, 762 (Ill. App. Ct. 1988) ("[A]n insurer may justifiably refuse to defend only where it is apparent from such a comparison that the allegations fail to state *any* claim within, or potentially within, the scope of policy coverage."). Because the duty to defend does not hinge on the draftsmanship skills or whims of the plaintiff in the underlying action, the court "should not simply look to the particular legal theories pursued by the claimant, but must focus on the allegedly tortious conduct on which the lawsuit is based." *Medmarc*, 612 F.3d at 613 (citing *Hurst-Rosche*, 51 F.3d at 1342); *see also State Farm Fire & Cas. Co. v. Young*, 968 N.E.2d 759, 763 (Ill. App. Ct. 2012) ("A court answers the question of whether a duty to defend exists by comparing the facts alleged in the underlying complaint to the language of the insurance policy."). If the policy language is unambiguous, the policy will be applied as written, unless it contravenes public policy. *PQ Corp.*, 860 F.3d at 1030. "Courts will not strain to find ambiguity in an insurance policy where none exists." *Id.* Although policy terms and the allegations in the underlying complaint are liberally construed in favor of the insured, and any doubts and ambiguities are resolved against the insurer, this rule of construction comes into play only when the policy is ambiguous. *Id.*; *Amerisure Mut. Ins. Co. v. Microplastics, Inc.*, 622 F.3d 806, 811 (7th Cir. 2010).

The Court must therefore compare the language of the Policies with the allegations in the Underlying Suits to determine whether Everest has a duty to defend or indemnify Komarek.

**A.     Coverage**

Everest contends that there is no coverage under the Policies because plaintiffs in the Underlying Suits do not allege any wrongful act by Komarek in connection with the rendering of or the failure to render "Professional Services" as set forth in the Policies. Conversely, Komarek argues that there is a genuine issue of material fact in this regard.

It is undisputed that Komarek is insured under the Policies only as a "Registered Representative." (ECF No. 39, Def.'s Resp. Pl.'s LR 56.1 Stmt. ¶ 5.) The Policies provide as follows in pertinent part. Under the heading "Insuring Agreements" and the subheading "Coverage B: Registered Representative Errors & Omissions," the Policies state:

> The **Insurer**[4] will pay on behalf of a **Registered Representative** all **Loss** arising from a **Claim** first made against such **Registered Representative** during the **Policy**

---

[4]     The Insurer is Everest. The terms appearing in bold type are defined in the Policies.

> **Period**, or if applicable, the **Discovery Period**, and reported pursuant to Section[5] 9[,] Notice and Reporting, for any **Wrongful Act** committed by the **Registered Representative** but only if such **Wrongful Act** occurs in the rendering of or failure to render **Professional Services.**

(ECF No. 31-1, 191 Policy, and ECF No. 31-2, 201 Policy, at 1.) "Wrongful Act" is defined as "any actual or alleged act, error or omission by the **Broker-Dealer**, any director, officer, partner or employee thereof, or by any **Registered Representative**, in their respective capacities as such." (*Id.* at 7.)

The Policies further provide as follows:

"**Professional Services**" means:

(1) if rendered in connection with an **Approved Activity**:

  (i) the purchase or sale of securities, including investment companies, variable annuities or variable life insurance for or on the behalf of a customer or client of the **Broker-Dealer** pursuant to a written agreement between the **Broker-Dealer** and the customer or client; or
  (ii) the purchase or sale of any **Life Product**;

(2) providing brokerage services for individual retirement accounts, Keogh retirement plans and employee benefit plans (but excluding in all cases multiple employer or multi-employer welfare arrangements), but only when such plans are funded with the products identified in subparagraph (1) above;

(3) **Investment Advisory Services**; and

(4) in connection with or incidental to any of the foregoing activities set forth in subparagraphs (1) and (2) above, providing:

  (i) economic advice or financial advice;
  (ii) financial planning advice, including, without limitation, any of the following activities in conjunction therewith: the preparation of a financial plan or personal financial statements, the giving of advice relating to personal risk management, insurance, savings, investments, retirement planning or taxes; or
  (iii) services in the capacity as a notary public;

---

[5] The 191 Policy refers to "Section 9." The 201 Policy refers to "Clause 9."

provided that, in all cases, the **Registered Representative** has obtained all relevant licenses required by the **Broker-Dealer**, an insurance carrier, or applicable law or regulation.

(191 Policy at 5.)[6]

An "Approved Activity" is defined as "a service or activity performed by a **Registered Representative**: (1) which has been approved by the **Broker-Dealer** to be performed by the **Registered Representative**; and (2) which is performed in connection with the purchase or sale of [or solicitation for, in the 201 Policy] an **Approved Product** to be transacted through the **Registered Representative**; and (3) for which the **Registered Representative** has obtained all licenses required by the **Broker-Dealer**, an insurance carrier, or applicable law or regulation." (191 Policy at 2; 201 Policy at 2.) An "Approved Product," in turn, is defined as "any: (1) securities, including investment companies, variable annuities, or variable life insurance products, that are approved by, and offered for sale through, the **Broker-Dealer**; or (2) **Life Product** offered for sale by an insurance company." (*Id.* at 2.)

The Policies further provide as follows:

> "**Investment Advisory Services**" means the following services rendered by an investment advisor representative, pursuant to a written agreement between the **Broker-Dealer** and the customer or client: providing financial, economic or investment advice or investment management services, but only if the investment advisor representative received approval from the **Broker-Dealer** prior to rendering such services. Further, with respect to the foregoing services, when in connection with the purchase or sale of an investment and/or insurance product, such product must qualify as an **Approved Product.**

(*Id.* at 4.)

Next, the Court looks to the complaints in the Underlying Suits to see whether they contain facts that bring the claims against Komarek potentially within the Policies' requirement that her alleged wrongful conduct have occurred in the rendering of or failure to render "Professional Services" as that term is defined in the Policies. The state-court plaintiffs allege the following pertinent facts.[7] The Pierceys' law firm, Piercey & Associates, Ltd. ("P&A"), also used the business name Family Wealth Legacy ("FWL") to offer services like financial and legal planning. (ECF No. 31-3, Moreth Compl. ¶¶ 3-4.) At some point, when Komarek and Birkley were associated with the broker-dealer Wells Fargo Advisors, LLC ("Wells Fargo"), they entered into

---

[6] The 201 Policy contains additional language in subsection (1) of the definition of "Professional Services," (201 Policy at 5), but the differences between the two policies do not appear to be material for purposes of this discussion.

[7] The parties agree that the allegations of the two complaints in the Underlying Suits are "nearly identical in substance." (Def.'s Resp. Pl.'s LR 56.1 Stmt. ¶ 34.) For simplicity, the Court cites only to the complaint in the Moreth Suit.

an "estate planning-financial planning joint venture" with Matthew Piercey, Rodney Piercey, P&A, and FWL. (*Id*. ¶¶ 61, 63, 83-84.) To facilitate this joint venture, Komarek and Birkley formed an LLC called "FWL Solutions" in September 2017. But "Birkley and Komarek's broker-dealer" (evidently, Wells Fargo) refused to allow them to operate under that name, so in October 2017 they formed NBB Group for the same purpose. (*Id*. ¶ 65.) In November 2017, Komarek and Birkley left Wells Fargo to associate with SagePoint. They sought SagePoint's approval of FWL Solutions as an outside business activity, but SagePoint refused, resulting in their seeking and receiving approval for NBB Group as an outside business activity.

Pursuant to their joint venture with the Pierceys and their entities, Komarek, Birkley, and NBB Group transferred their clients' accounts from third-party broker-dealers to SagePoint for the purpose of further transferring the clients' assets to accounts under the control of Komarek, Birkley, and one or more of the Pierceys so that the money could be placed in "investments offered through [Matthew] Piercey, P&A, and FWL," including investments in promissory notes and hedge funds. (*Id*. ¶¶ 12, 66-67.) Komarek and Birkley "actively managed" client accounts that held investments with the Piercey entities, including plaintiffs', by "offering interest rate returns on investments, arranging for accounts to be transferred, [and] meeting with clients at P&A offices to solicit further investments[] and to resolve problems that clients had with the investments and accounts." (*Id*. ¶ 68.) Komarek, Birkley, and NBB Group further supported the joint venture by providing clients with spreadsheets analyzing the potential returns on investments offered by Matthew Piercey and his entities.

The state-court plaintiffs further allege that Komarek, Birkley, and NBB Group participated in soliciting them to invest in various investment products offered through Matthew Piercey, and in doing so, made materially false or untrue statements or aided and abetted Matthew Piercey's false statements, among them representations that Matthew Piercey had developed a trading algorithm called "Zolla" that had a potential buyer in a foreign company called "Clarinova"; returns on investments offered through P&A and FWL featured "contractually guaranteed returns including an 8% annual return from Zolla"; plaintiffs could get their money back at any point in time because their investment funds could be quickly liquidated; and there was "no market risk." (*Id*. ¶ 281.) According to plaintiffs, Komarek, Birkley, and NBB Group had reason to know that these statements were false because they knew that Matthew Piercey had not developed such an algorithm; he could not provide any "returns" whatsoever; and he was taking plaintiffs' investment funds to pay for his own personal expenses and to pay back other investors and perpetuate a Ponzi scheme. (*Id*. ¶ 282.)

On March 12, 2020, Moreth received a grand-jury subpoena, evidently regarding Matthew Piercey and his affiliated entities. Prior to that date, Komarek, Birkley, the Pierceys, and their related entities had received similar grand-jury subpoenas. After SagePoint clients began to file complaints with SagePoint, the relationship between SagePoint and Komarek and Birkley deteriorated, and on June 4, 2020, Komarek and Birkley "admitted their involvement in the Piercey Scheme." (*Id*. ¶ 82.) Their employment with SagePoint was then terminated.[8]

---

[8] SagePoint terminated Komarek's employment sometime between June and August 2020. (Def.'s Resp. Pl.'s LR 56.1 Stmt. ¶ 41.)

Plaintiffs assert claims against Komarek for conspiracy to defraud, aiding and abetting fraud, and aiding and abetting breach of fiduciary duty. Moreth also asserts a claim against Komarek for violation of the Illinois Securities Law of 1953, 815 ILCS 5/1 *et seq.*[9]

Everest maintains that there is no coverage under the Policies because the wrongful acts Komarek allegedly engaged in are not alleged to have been in the rendering of or failure to render "Professional Services," which requires selling, servicing or providing advice relating to certain financial products in connection with (1) an "Approved Activity" (one that was approved by SagePoint and in connection with an "Approved Product," one that was approved by SagePoint and "offered for sale through" SagePoint) or (2) the provision of "Investment Advisory Services" (services rendered by Komarek that received approval from SagePoint and, when in connection with the sale of an investment or insurance product, the product was approved by SagePoint and "offered for sale through" SagePoint). The Court agrees with Everest. The state-court plaintiffs allege that Komarek, Birkley, and NBB Group conspired with Matthew Piercey to transfer clients' funds *away* from SagePoint accounts and into fraudulent FWL accounts and investments offered by Matthew Piercey and his affiliated entities, not products offered or approved by SagePoint. (Moreth Compl. ¶¶ 12, 76-79.) In fact, the state-court plaintiffs further allege that SagePoint negligently supervised Komarek and there were numerous "red flags" it should have spotted that would have revealed her "wrongful sales" and "selling away" of securities through Matthew Piercey and his related entities. (*Id.* ¶¶ 79, 317.)

Komarek's sole response is an assertion that because the state-court plaintiffs allege that SagePoint refused to approve her and Birkley's operation of an outside business activity under the name "FWL Solutions" but approved such activity under the name "NBB Group," "it is not clear" whether the refusal with respect to FWL Solutions "also meant that SagePoint refused to allow Komarek and Birkley to recommend investments through SagePoint." (ECF No. 40, Def.'s Am. Resp. Pl.'s Mot. Summ. J. at 5-6.) Therefore, says Komarek, a genuine issue of material fact exists as to whether the Underlying Suits allege a wrongful act in connection with an "Approved Activity" as defined in the Policies. This is a convoluted and unpersuasive argument in which Komarek fails to meaningfully engage with the language of the Policies. As Everest points out in reply, SagePoint's approval for Komarek's operation of NBB Group as an outside business activity says nothing about its approval to sell or service the investments or other financial products that were part of the alleged Piercey scheme. The allegation on which Komarek relies is irrelevant to whether Komarek's conduct with regard to the state-court plaintiffs involved "Approved Products"—that is, products approved by, and offered for sale through, SagePoint. And it is clear from the other underlying allegations that Komarek's alleged participation in the fraudulent scheme involved products that were offered for sale not through SagePoint but through Matthew Piercey and his entities. (*See, e.g.*, Moreth Compl. ¶¶ 11, 12, 295, 303, 311, 317.) There are no facts alleged from which it could reasonably be inferred that the scheme involved the sale of investment products that were approved or offered by SagePoint. (It is noteworthy that Komarek

---

[9] Komarek denies without elaboration that Moreth brings these claims against her, (Def.'s Resp. Pl.'s LR 56.1 Stmt. ¶ 33), but cites nothing in support of this denial, which is belied by Moreth's complaint.

does not contend otherwise.) Rather, plaintiffs expressly allege that Komarek was "selling away." (*Id.* ¶ 317; ECF No. 31-4, Rieber Compl. ¶ 340).[10]

The Court has carefully reviewed the state-court plaintiffs' complaints in the Underlying Suits. Plaintiffs' claims are not based on allegations that Komarek engaged in conduct that involved the rendering of, or failure to render, "Professional Services," which the Policies unambiguously define in material part as those performed in connection with the purchase or sale of a product approved by and offered for sale through SagePoint. Everest thus has no duty to defend Komarek in connection with the Underlying Suits. Because Everest owes Komarek no duty to defend, it owes her no duty to indemnify. *See Nationwide Ins. Co. v. Cent. Laborers' Pension Fund*, 704 F.3d 522, 528 (7th Cir. 2013) (citing *Crum & Forster*, 620 N.E.2d at 1081). The Court will enter summary judgment in favor of Everest on Counts I and II of the complaint to the extent that it seeks a declaration in those counts that the insuring agreements of the Policies are not satisfied.[11]

**B.     "Selling Away" Exclusion**

Everest is also entitled to judgment on Count III of the complaint, in which it seeks a declaratory judgment that it has no duty to defend or indemnify Komarek due to Exclusion (ff) of the Policies. Exclusions are read narrowly and apply only if their application is "clear and free from doubt." *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 309 (7th Cir. 2021).

The Policies unambiguously provide in Exclusion (ff) that the "**Insurer** shall not be liable for **Loss** in connection with any **Claim** . . . with respect to coverage provided under Coverage B [for Registered Representative Errors & Omissions] only, alleging, arising out of, based upon or attributable to any activity of, or service provided by, a **Registered Representative** other than a covered **Professional Service**, including, but not limited to "selling away[.]" (Policies at 7, 11.)

As discussed above, the state-court plaintiffs allege in the Underlying Suits that Komarek was "selling away" when she engaged in the Piercey scheme. They allege that Komarek used her outside business, NBB Group, to move plaintiffs' funds and solicit plaintiffs to put their funds into investments that were sold through Piercey's entities—not SagePoint. The claims therefore are excluded from coverage under the plain language of the Policies.

---

[10]     "Selling away is the practice by an individual broker of selling securities outside the purview of his broker-dealer employer." *In re Zinck*, 321 B.R. 916, 919 (Bankr. W.D. Wis. 2005).

[11]     The organization of Everest's complaint is clunky. Everest framed Count I as pertaining to the 201 Policy and Counts II and III as pertaining to the 191 Policy, and it unnecessarily set out specific discrete legal theories in these counts. (Everest also noted that it was reserving the right to argue that other terms and exclusions of the Policies may bar or limit coverage.) As to the insuring agreements and Exclusion (ff), Everest has broadened those theories in its summary-judgment motion to apply to both Policies. Because complaints need not set out legal theories, the Court follows the parties' lead in treating Counts I, II, and III as applying to coverage and exclusion issues under both Policies.

Komarek contends that it is not clear from the face of the underlying complaints that Exclusion (ff) applies because there are no "express" allegations in the underlying complaints that Komarek was "selling away." (Def.'s Am. Resp. Pl.'s Mot. Summ. J. at 6.) This is an incorrect characterization of the state-court plaintiff's allegations. They expressly allege that "SagePoint ignored red flags associated with G. Birkley and C. Komarek's outside business activity, NBB Group, and *their selling away of securities* through P&A, FWL, and an outside money manager, M. Piercey." (Moreth Compl. ¶ 317; Rieber Compl. ¶ 340 (emphasis added).) They also allege that SagePoint failed to monitor Birkley and Komarek's emails "related to the *selling away of securities*" through those entities. (*Id.* (emphasis added).) While these allegations that Komarek "sold away" are contained within claims against SagePoint, they are nonetheless allegations that she "sold away." In any event, there is no requirement that the underlying complaints invoke the talismanic phrase "selling away" for Exclusion (ff) to apply. *See Santa's Best*, 611 F.3d at 346 (the underlying factual allegations control, not any labels that may be attached to those allegations). The state-court plaintiffs base their claims against Komarek on allegations, repeated throughout their complaints, that her role in the Piercey scheme involved the sale or promotion of investment products that were offered not through SagePoint but through Matthew Piercey and his related entities. The Policies clearly exclude coverage for that conduct.

**C.     Remaining Claims**

Everest presents an additional argument in its motion that there is no coverage under the 201 Policy because it applies only to claims that were "first made" against a Registered Representative during the Policy Period of December 31, 2020 to December 31, 2022, and the underlying claims here were not "first made" during that period because they allege "Interrelated Wrongful Acts" with claims reported prior to that period. Everest states, however, that the Court "need not reach this [] issue if it concludes" that the Underlying Suits "do not trigger the Policies' Insuring Agreements or fall within the scope of the selling away exclusion." (ECF No. 41, Pl.'s Reply at 7.) The Court has concluded that the insuring agreements are not satisfied and that the selling-away exclusion applies, so it is unnecessary to reach the "first made" issue.

At Everest's request, Counts IV and V will be dismissed as moot. (*See* Pl.'s Reply at 9.) Furthermore, Everest states that in the event its motion is granted, "the Court may proceed to final judgment," (*id.*), so the Court will dismiss the nominal defendants and close the case.

**CONCLUSION**

Plaintiff's motion for summary judgment [30] is granted. Because the insuring agreements of the policies are not satisfied and the allegations of the Underlying Suits fall within the scope of the "selling away" exclusion, plaintiff has no duty under the 191 Policy or the 201 Policy to defend or indemnify defendant Cynthia Komarek in relation to the Underlying Suits. Judgment will be entered in favor of plaintiff, Everest National Insurance Company, and against defendant Cynthia Komarek on Counts I, II, and III of the complaint. Counts IV and V are dismissed with prejudice as moot. Nominal defendants Cary Moreth, Mary Rieber, James Rieber by and through his personal representative Victor Rieber, Harry Howarth, and Diane Howarth are dismissed. Civil case terminated.

**DATE:** April 25, 2023

                                                */s/ Ronald A. Guzmán*
                                           **Hon. Ronald A. Guzmán**
                                           **United States District Judge**